## BENTELER INDUSTRIES, INC., Plaintiff,

v.

## The UNITED STATES, Defendant.

### Court No. 88–07–00540.
### Slip Op. No. 93–237.

United States Court of International Trade.

Dec. 20, 1993.

Sonnenberg, Anderson, O'Donnell & Rodriguez, Thomas J. O'Donnell and Michael A. Johnson, Chicago, IL, for plaintiff.

Frank W. Hunger, Asst. Atty. Gen.; Joseph I. Liebman, Attorney-in-Charge, Intern. Trade Field Office, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice Pamela G. Larrabee, Washington, DC, for defendant.

## OPINION

AQUILINO, Judge:

This action, which has been designated a test case pursuant to CIT Rule 84(b), contests denial by the U.S. Customs Service of entry at the port of Chicago, Illinois of seamless steel tubular sections from the Federal Republic of Germany. Customs denied entry (and the protest thereof) upon a determination that that merchandise was within the ambit of a so-called voluntary restraint agreement between the European Economic Community ("EEC"), including Germany, and the United States requiring an export license, which was not among the import papers.

### I

The agreement referred to has been recorded as "Arrangement in the form of an exchange of letters with the United States of America concerning trade in steel pipes and tubes" (Oct. 1, 1985) [1], which provide, among other things:

1. The EEC shall restrain exports to, or destined for consumption in, the USA of

1. See 29 O.J.Eur.Comm. (No. L 9) (1985).

steel pipes and tubes described in Annex A, originating in the Community ... to a level of 7,6% of US apparent consumption for calendar years 1985 and 1986. During this period, export licences shall be required for pipes and tubes.[2]

Annex A to the letters lists classification numbers of the parties, including item 610.-4045 et seq. from the Tariff Schedules of the United States ("TSUS").

Upon attempted entry, Customs concluded that the steel sections at issue were classifiable under TSUS item 610.52 (1988) as "Pipes and tubes and blanks therefor, all the foregoing of iron (except cast iron) or steel ...: Other ...: Other ...: Not suitable for use in the manufacture of ball or roller bearings ...: Alloy iron or steel ...: Other". That item is listed in Annex A to the restraint agreement as well as in TSUS Schedule 6, Part 2 ("Metals, Their Alloys, and Their Basic Shapes and Forms").

Entry has been sought for the merchandise for installation in automobiles, and the putative importer, now the plaintiff herein, takes the position that the sections are classifiable under TSUS Schedule 6, Part 6 ("Transportation Equipment"), in particular item 692.32 thereunder ("Chassis, bodies (including cabs), and parts of the foregoing motor vehicles ...: Other: ... Other: ... Other").

Customs has abided by its original decision, which has led to commencement of this and similar, other cases.

Trial herein was governed by a pretrial order, setting forth a number of uncontested facts, among other things, but also by an order protecting the proprietary information adduced, including that constituting some of those facts. Discussion hereinafter is thus restricted by the concerns for confidentiality.

## II

The pretrial order stipulates the excluded merchandise to be comprised of three 20–piece sets of seamless tubular sections

shipped from Benteler Werke A.G., Paderborn, Germany to the plaintiff, each group of which has enumerated characteristics as to length, weight, wall thickness, outer diameter, melt number, chemical composition, etc. Furthermore:

8. Plaintiff uses the merchandise, in its condition as imported, solely to produce automotive reinforcement side-door beams and assemblies to minimize the safety hazard caused by intrusion into the passenger compartment in a side impact accident.

9. The anti-impact performance of side-doors on passenger automobiles required by the United States Government is set forth in Federal Motor Vehicle Safety Standard (FMVSS) 214, published at 49 C.F.R. 571.214, promulgated December 2, 1971 and amended March 17, 1980.

10. After importation, the merchandise is either straight-cut or contour-cut on laser cutting machines to length.

11. After the imported tubular sections are cut to length by straight or contour-cut, brackets are in some cases attached to each end by welding. In the case of door beams for [name deleted], one end is deformed and the other has a plug inserted.

  *  *  *  *  *  *

17. Benteler Werke, A.G., Paderborn, Germany, is the assignee of the U.S. Patent No. 4,210,467, issued July 1, 1980 to Stefan Klatzer, Schloss Neuhaus, and Winfried Dickhoff, Paderborn ... entitled "Method of Making a Reinforcement for Vehicle Doors."

18. Benteler Werke, A.G. ... is also the owner of German Patent No. DE 27 50 867 C2, filed on November 14, 1977 and granted on October 20, 1983, showing as inventors Stefan Klatzer and Winfried Dickhoff, and entitled "Use of Steel Alloy For Tubes for Door Reinforcement."[3]

---

**2.** *Id.* at p. 2, para. 1 (Letter No. 1 A. Letter from the European Economic Community) and p. 5, para. 1 (Letter No. 1 B. Letter from the United States of America) (1985).

**3.** Pretrial Order, Schedule C, pp. 3, 4.

The foregoing, stipulated paragraph 8 incorporates the stated purpose and scope of the referenced federal safety standard No. 214, which applies to U.S. passenger cars and requires that their side doors have initial, intermediate and peak crush resistances with seats removed of not less than 2,250 pounds, 3,500 pounds, and two times the curb weight of the vehicle or 7,000 pounds, whichever is less. If a manufacturer opts to test with seats installed, the required minimum respective resistances are 2,250 pounds, 4,375 pounds, and three and one half times the curb weight of the vehicle or 12,000 pounds, again whichever is less. 49 C.F.R. § 571.214 S3.

As indicated in the pretrial order quoted above, patent DE 2750867 C2 was filed with the German Patent Office on November 14, 1977 and granted on October 20, 1983 *sub nom. Verwendung einer Stahllegierung fuer Rohre zur Tuerverstaerkung.* The claim for this patent, the foregoing title of which has been translated per plaintiff's exhibit 3 as "Use of a steel alloy for tubes for door reinforcement", is translated in the exhibit, in part, as follows:

> Use of a steel alloy consisting of 0.14 to 0.18% carbon, 0.15 to 0.3% silicon, 1.6 to 1.8% manganese, 1.9 to 2.1% chromium, 0.45 to 0.60% molybdenum, an aluminum content required for deoxidizing—of at least 0.015%—and the remainder of iron, to be used as a material for tubes or shaped tubes for reinforcing the doors of motor vehicles, which (tubes) are manufactured in accordance with conventional methods, annealed at 900 to 930 degrees Celsius and then air-cooled.

-------

The invention relates to the use of a steel alloy for manufacturing tubes or shaped tubes for reinforcing the door of a motor vehicle, whereby a steel tube is used as a mechanical tube which, after the final heat treatment, is hot-shaped to manufacture the tube or the shaped tube.

The tube or shaped tube is a so-called impact absorber.

\*     \*     \*     \*     \*     \*

If sufficient safety against external mechanical force is to be provided, the mechanical characteristics of the steel tube or of the shaped steel tube must meet certain minimum requirements. In some countries, there already exist legal provisions, which specify the minimum requirements as to the mechanical characteristics of the door reinforcement of motor vehicles.

\*     \*     \*     \*     \*     \*

The values specified for tensile strength, limit of stretch, break elongation and ... deformation have been achieved up to now by using ... steel tubes that have been manufactured from titanium-alloyed steels or from S[t] 52–3.

The use of such steel tubes, however, has the disadvantage that the heat treatment of the tubes consists of a great number of treatment steps, especially extensive tempering measures, such as for instance, hardening in a salt bath and drawing the temper in oil subsequent to the final heat treatment and/or the hot-forming in the case of steel tubes based on St 52–3. The heat-treatable state must be attainable for steels with high carbon content as well as for alloyed steels.

The purpose of the invention was, therefore, to specify a steel alloy for tubes or shaped tubes for the purpose of reinforcing doors of motor vehicles, the mechanical characteristics of which would meet the minimum requirements after a simple heat treatment and which would not change substantially even as a result of design-related hot-forming.

This purpose is being met by the use of the alloy specified in [this] claim....

In contrast to the use of known alloys, from which tubes or shaped tubes for reinforcing the door of a motor vehicle are manufactured, and which are derived from a steel tube of titanium-alloyed steel or from St 52–3, the use of the alloy pursuant to the invention has the advantage that the specified values of tensile strength, limit of stretch, break elongation, and ... of deformation are achieved without the need to subject the steel tube or the shaped tube to any time-consuming quenching and tempering processes subsequent to the heat

treatment and the hot-forming. In addition, realigning of the tube or the shaped tube may be dispensed with.

Expert testimony at the trial supported the foregoing claim[4], except for the need to anneal. Nonetheless, defendant's expert took the position that the merchandise derived from the patent(s) and denominated as BTR 110[5] is within the ambit of the standard specification of the American Society for Testing and Materials ("ASTM") for seamless carbon and alloy steel mechanical tubing, number A519–86b[6].

That specification is stated to cover "several grades of carbon and alloy steel seamless mechanical tubing" which are listed in tables setting forth chemical requirements for low-carbon, other-carbon and alloy steels. Table 3 lists some 99 designated grades of alloy steel, not one of which exactly matches the chemical composition of BTR 110. *Cf.* Tr. at 213. Indeed, defendant's expert testified, and the court so finds, that the merchandise at issue has a "unique chemical content". *Id.* at 217. And the interaction of that content plus the heat-treating process are the primary reasons for its claimed uniqueness. *See id.* at 35.

### III

Whatever the content or the claim, the Customs Courts Act of 1980 provides that, in

an action such as this, the classification by the Service "is presumed to be correct" and the "burden of proving otherwise shall rest upon the party challenging such decision." 28 U.S.C. § 2639(a)(1).

The defendant points out that chief use, rather than actual use, of a good is dispositive and that TSUS General Interpretive Rule 10(e)(i) defined chief use as "the use that exceeds all other uses (if any) combined." On its part, the plaintiff takes the position that, since its merchandise is properly classifiable as unfinished parts of motor vehicles, exclusion by Customs under the provision for pipes and tubes *eo nomine*[7] was precluded by headnote 1(iv) to Schedule 6, Part 2, which stated that that provision did not cover "other articles specially provided for elsewhere in the tariff schedules, or parts of articles." Under General Interpretive Rule 10(ij), to fall within the provision for automotive parts, the merchandise as imported had to be "solely or chiefly used as a part of" an automobile.

In *United States v. Buss & Co.*, 5 Ct.Cust. App. 110, T.D. 34138 (1914), the court addressed whether cotton for coat hangers, which for reasons of economy was first woven "in the piece", was correctly classifiable as cotton tape, or as coat hangers, consistent with its actual use in the United States. The court stated that, in determining when mate-

---

**4.** A similar claim is contained in U.S. patent 4,210,467, issued July 1, 1980 and entitled "Method of Making a Reinforcement for Vehicle Doors". *See* Joint Exhibit 13; trial transcript ("Tr."), p. 22.

The plaintiff also produced a copy of its U.S. patent 4,636,608, dated January 13, 1987 and entitled "Laser Contour Cut Door Beams", the abstract of which states:

A contour cut door beam for automobiles, and apparatus and method of forming same. A steel tube is contour cut with a laser beam from a source offset from an operative axis coincident with the tube axis, using simultaneous rotational and linear advancement between the tube and cutting beam to form an arcuate outer end terminus on the tube in a plane transverse to the axis, an arcuate inner terminus on the opposite side of the tube in a second plane transverse to the axis, and a pair of mirror image contoured edges joining said termini, with all portions being on radii relative to said axis.

Plaintiff's Exhibit 1, third page.

**5.** This designation is derived in turn from the letter B in the name Benteler plus T from *Tuer* and R from *Rohr*. The number refers to a minimum tensile strength of 110 kilograms per square millimeter. *See, e.g.,* Tr. at 10.

**6.** *See, e.g.,* Tr. at 212.

**7.** The plaintiff does concede that its goods meet the

definition of pipes and tubes set forth in Headnote 3, Schedule 6, Part 2, TSUS, since they are all tubular (hollow) and the tariff definition includes tubes of all cross-sections. Additionally, they contain alloying elements in quantities which place them within the generic definition for other alloy steel in Headnote 2, Subpart B, Schedule 6, TSUS, and therefore within the generic language of TSUS item 610.52, which covers other pipes and tubes of alloy iron or steel.

Plaintiff's Post–Trial Brief at 59–60 (footnote omitted).

rial becomes an "article specially provided for", the

> rule of decision is ... that where such articles are imported in the piece and nothing remains to be done except to cut them apart they shall be treated for dutiable purposes as if already cut apart and assessed according to their individual character or identity. This follows, however, only in case the character or identity of the individual articles is fixed with certainty and in case the woven piece in its entirety is not commercially capable of any other use.

5 Ct.Cust.App. at 113. The court held the cotton met this test. The articles were used exclusively for coat hangers, and while they are "not absolutely incapable of use in the piece as tapes ... the cross marks which have been woven into them are unnecessary and even detrimental to such uses." *Id. See also E.M. Chemicals v. United States*, 13 CIT 849, 856–58, 728 F.Supp. 723, 728–30 (1989), *aff'd*, 920 F.2d 910 (Fed.Cir.1990); *Heraeus–Amersil, Inc. v. United States*, 10 CIT 258, 261, 640 F.Supp. 1331, 1333 (1986); *Doherty–Barrow of Texas, Inc. v. United States*, 3 CIT 228, 231–32, 1982 WL 2232 (1982); *Bendix Mouldings, Inc. v. United States*, 73 Cust.Ct. 204, 205, C.D. 4576, 388 F.Supp. 1193, 1194 (1974).

The defendant argues that the class or kind of merchandise at bar is mechanical tubing, which was defined by its expert trial witness as a "custom made product produced in many sizes and shapes and to a wide variety of chemical composition[s] and mechanical properties."[8] He compared a common type of ASTM A519 tubing with BTR 110 and concluded the latter's dimensions could be altered to meet the specifications for the more common type and, in that form, would be cheaper. *See* Tr. at 203–05; Defendant's Exhibit W. However, the witness also testified that that type, if made to the BTR 110 dimensions, would not be suitable for use as a car-door beam since it would be too heavy and not have the same tensile strength. Tr. at 219–21.

At trial, Benteler advertisement for, and a little evidence of, use of BTR 110 other than as side car-door beams was adduced, but not in the United States, where the exclusive application has been automotive[9], as projected in the patent(s) and stipulated by the parties, *supra*. While any desire for a broader market for the product on the part of the manufacturer is understandable, the clear weight of the evidence before the court is counter to wider commercial acceptance due to expense and to limited workability, which results from its chemical content and its physical characteristics like diameter, wall thickness and inner tubular surface. *See id.* at 57, 58, 76, 77, 79, 98, 166–67. Defendant's expert could only conjure up "a number of potential applications." *Id.* at 203.

The BTR 110 sections were designed at the request of automakers to conform to "rigid specifications as to chemical composition and tensile strength" as well as to stretch, break elongation and deformation load so as to meet FMVSS 214, to quote from *Doherty–Barrow of Texas, Inc. v. United States*, 3 CIT at 232. *See also Heraeus–Amersil, Inc. v. United States*, 10 CIT at 262, 640 F.Supp. at 1333 (the merchandise "was manufactured to particular specifications and ... was designed for, and used only as, contacts in certain telephone relays"). In short, BTR 110 possesses a specific utility different from the class. *United States v. Carborundum Company*, 536 F.2d 373, 377 (CCPA), *cert. denied*, 429 U.S. 979, 97 S.Ct. 490, 50 L.Ed.2d 587 (1976). And the court finds that BTR 110 is chiefly used, in fact is dedicated to be used, as automotive side-door impact beams.

---

8. Defendant's Post–Trial Brief at 21, quoting Tr. at 195. However, the factors listed by the courts in *United States v. Carborundum Company*, 536 F.2d 373, 377 (CCPA), *cert. denied*, 429 U.S. 979, 97 S.Ct. 490, 50 L.Ed.2d 587 (1976), and *Standard Commodities Import Corp. v. United States*, 12 CIT 296, 299 (1988), as pertinent in determining the class or kind of merchandise in question, in particular, the expectations of ultimate purchasers; the channels, class or kind of trade in which the merchandise moves; the environment of the sale; and the economic practicality of using the import in the same manner as merchandise which defines the class, do not lend support to this position on the part of the defendant.

9. *See, e.g.*, Tr. at 53, 82, 97, 203.

However, proof of use is not sufficient. The plaintiff also has to establish that the merchandise is so far advanced in manufacture as to be identifiable as an unfinished automotive part. *See, e.g., American Import Co. v. United States,* 26 CCPA 72, 75, T.D. 49612, 1938 WL 4060 (1938); *Coraggio Design, Inc. v. United States,* 12 CIT 143, 145, 1988 WL 18991 (1988) ("It is well settled that 'no matter how close the importation is to the finished article or how dedicated it is to a single use, it remains a material until the identi[t]y of actual articles can be seen emerging with certainty from the undifferentiated material'", quoting *Bendix Mouldings, Inc. v. United States,* 73 Cust.Ct. at 206, 388 F.Supp. at 1194–95). The plaintiff relies on *Doherty–Barrow of Texas, Inc. v. United States, supra,* in which the court held that steel strip imported in coils was sufficiently advanced in manufacture to be considered bale ties. The merchandise was found to be "in conformance with rigid specifications as to chemical composition and tensile strength" and, beyond cutting, required no additional processing, manufacturing or finishing. 3 CIT at 232. Thus, the court concluded that "the character or identity [of the coils] ... is fixed with certainty, and, accordingly, an article specially provided for as a bale tie made from strip". *Id.* Similarly, the court in *Heraeus–Amersil, Inc. v. United States, supra,* found that contact tape imported in reels had been so advanced in manufacture as to be considered parts of telephone relays rather than semi-manufactured rolled precious metal even though the tape required cutting and welding after importation. 10 CIT at 262–63, 640 F.Supp. at 1334.

In *Bendix Mouldings, Inc. v. United States, supra,* the court held that nine-foot wood moldings imported for use in making frames were material rather than unfinished frames as there were "no individual frames, finished or unfinished, whose identity was fixed with certainty at the time of importation". 73 Cust.Ct. at 206, 388 F.Supp. at 1194. The decision relied on the opinion in *American Import Co., inter alia,* where the issue was whether lengths of silk fishing leader gut were more properly classified as unfinished leaders rather than as manufactures of silk. Although recognizing that that merchandise was undeniably material for the making of leaders and that "the only thing to be done to make the finished leader is to cut [it] to length and, after soaking to soften the same, tie the loops", the court held that the

> mere fact that the instant merchandise is chiefly used, or for that matter exclusively used for leaders ... does not take it out of the "material" class.... The mere fact that a thing has but one use does not require that it be considered as an article unfinished. If the material has been so far processed from the "material" stage to a partly-completed article, then it loses its character as material and takes on the characteristics of the article for which the material was intended.

26 CCPA at 75–76. In contrast, in *Lee Enterprises, Inc. v. United States,* 84 Cust.Ct. 208, C.D. 4860 (1980), the court concluded that plates were parts of printing machines rather than articles of aluminum, as they "were dedicated to use as printing plates, and ... the identity of the individual article was fixed with certainty" even though they required trimming, hole-punching and bending after importation. *Id.* at 213, 214. *Bendix Mouldings* and *American Import* were distinguished, as the merchandise therein was "imported in rolls, coils, reels or lengths rather than individual pieces". *Id.* at 213. The court relied, in part, on *Geo. S. Bush & Co. v. United States,* 34 CCPA 17, C.A.D. 338, 1946 WL 4427 (1946). As in *American Import,* the merchandise at issue was silk gut for use as leaders in fishing lines. Because the merchandise was imported in five- to seven-foot lengths rather than in coils, the court was able to distinguish *American Import* and conclude that "each piece of the merchandise in question was dedicated to the making of a particular length of leader." 34 CCPA at 20. That is, the "exact point in the processing at which the material becomes a partly finished article must be determined on the basis of the circumstances of each case." *Coraggio Design, Inc. v. United States,* 12 CIT at 145.

In this case, the parties have stipulated that the lengths of the BTR 110 sections sought to be entered are 6.09, 5.87 and 6.75 meters. *See* Pretrial Order, Schedule C, pp.

1, 2. The defendant points to the fact that there are no visible markings to indicate "where each tube will be cut so as to identify with certainty the individual articles". Defendant's Post–Trial Brief at 14 (citations omitted). However, the sections are painted with colored bands, and the laser-cutting process has eliminated the need for such markings, since the required measurements are programmed into the cutting machine. *See* Tr. at 142–44. That is, the number of beams to be cut exactly from each section is known prior to importation. *See id.* at 142–43, 168–69. *Cf. Doherty–Barrow of Texas, Inc. v. United States,* 3 CIT at 232 n. 2 ("Reasons of economy similar to those found in *J.E. Bernard v. United States,* 50 Cust.Ct. 41, C.D. 2386 (1963), may require that the ties be imported coiled rather than cut to length"). At importation, the sections are differentiated by part numbers [10], as well as by color code, and each is also identifiable by its diameter and wall thickness. In other words, the "design is specific to a type of door and door structure". Tr. at 123, 168.

The defendant also argues that the material undergoes substantial additional processing after importation, noting that Benteler itself refers to a three-stage manufacturing process. *See* Defendant's Post–Trial Brief at 14. The laser-cutting is only the second stage; the beams are not delivered to the automakers until welding to extension brackets, if required, is completed. Defendant's expert calculated the total cost of such processing incurred after importation as quite high. *See* Tr. at 211. In fact, the completed assemblies are stamped as manufactured in the U.S.A. *See, e.g.,* Joint Exhibit 5. However, it is the particular U.S. automaker which determines how the beams are to fit into its vehicle doors and therefore what additional processing, if any, is necessary. *See* Tr. at 129, 130, 175.

As the defendant argues, the "significant fact that the courts have looked to in distinguishing ... material from individual articles[ ] is whether the importations are dedicated to use for no more than a single article and are not bulk material from which an indiscernible number of articles could be

made after entry." Defendant's Post–Trial Brief at 8. In the light of all the evidence presented in this case, including those facts stipulated by the parties as to precise length, wall thickness, outer diameter, part number, car model and color code, the court finds that the seamless steel tubular sections are dedicated to a singular use and that an indiscernible number of articles could not be made from them upon entry. That is, the sections at issue are advanced enough in manufacture to be identified as unfinished automotive parts. And that use exceeds all other uses combined.

## IV

In *Jarvis Clark Co. v. United States,* 733 F.2d 873, *reh'g denied,* 739 F.2d 628 (Fed. Cir.1984), the court of appeals held that the "duty" of this Court of International Trade "is to find the *correct* result, by whatever procedure is best suited to the case at hand." 733 F.2d at 878 (emphasis in original). The search for that result in this case necessarily requires focus in the end on its unique legal setting, to wit, the Benteler patent(s) aimed at compliance with motor-vehicle-safety standards in this country, the voluntary restraint agreement between the EEC and the United States, as contrasted with the lack of a domestic equivalent for BTR 110. *See, e.g.,* Tr. 110–11. This focus leads the court to conclude that the statutory presumption of correctness on the part of Customs has been overcome, that is, the Service erred in denying entry to the BTR 110, which, as landed, is classifiable under TSUS item 692.32, which is not listed on Annex A to the aforesaid agreement. Moreover, the paragraphs numbered 8 in the letters comprising that agreement provide that the United States "shall accept exports of ... tubes ... where a shortage of supply is identified, i.e. where the US industry is unable to meet demand in the USA for a particular product." Such a circumstance is indicated in the record herein.

Judgment in favor of the plaintiff will therefore be entered.

10. *See* Tr. at 123, 143–44.

## JUDGMENT

This case having been duly submitted for decision; the court, after due deliberation, having rendered a decision herein; Now, therefore, in conformity with said decision, it is

ORDERED, ADJUDGED and DE-CREED that the seamless steel tubular sections which are the basis of this case are correctly classifiable under item 692.32 of the Tariff Schedules of the United States (1988) and therefore are admissible without an export license pursuant to the October 1, 1985 voluntary restraint agreement on pipes and tubes between the United States and the European Economic Community; and it is further hereby

ORDERED that the U.S. Customs Service permit the plaintiff to enter the aforesaid seamless steel tubular sections upon payment of any duties owing under TSUS item 692.32 (1988).

