# United States Court of Appeals for the Federal Circuit

05-1031

FUJITSU AMERICA, INC. and
FUJITSU IT HOLDINGS, INC. (now Fujitsu Computer Systems Corporation),

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee.

Lawrence J. Bogard, Neville Peterson LLP, of Washington, DC, argued for plaintiff-appellant. With him on the brief were Michael K. Tomenga and Catherine Chess Chen.

Saul Davis, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, of New York, New York, argued for defendant-appellee. With him on the brief were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, of Washington, DC, and Barbara S. Williams, Attorney in Charge, International Trade Field Office, of New York, New York. Of counsel on the brief was Chi S. Choy, Attorney, Office of the Assistant Chief Counsel, International Trade Litigation, United States Customs and Border Protection.

Appealed from: United States Court of International Trade

Judge Gregory W. Carman

# United States Court of Appeals for the Federal Circuit

05-1031

FUJITSU AMERICA, INC. and
FUJITSU IT HOLDINGS, INC. (now Fujitsu Computer Systems Corporation),

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee.

_____

DECIDED:  September 8, 2005

_____

Before MICHEL, Chief Judge, SCHALL, and LINN, Circuit Judges.

MICHEL, Chief Judge.

Fujitsu America, Inc. and Fujitsu IT Holdings, Inc. (collectively "Fujitsu") appeal the judgment of the U.S. Court of International Trade affirming the classification of Fujitsu's Coolant Distribution Unit ("CDU") by the U.S. Bureau of Customs and Border Protection ("Customs").[1]  Fujitsu Am., Inc. v. United States, 342 F. Supp. 2d 1326 (Ct. Int'l Trade 2004) (summary judgment opinion).  This appeal was submitted following oral argument on August 3, 2005.  Because Fujitsu's CDU is a device that treats a material by a process involving a change of temperature, the CDU was properly classified.  Accordingly, we affirm.

---

[1]  Effective March 1, 2003, the United States Customs Service was renamed the United States Bureau of Customs and Border Protection.  Homeland Security Act of 2002, Pub. L. 107-296, § 1502, 116 Stat. 2135, 2308-2309 (2002).

**I**

The imported device at issue in this case is Fujitsu's CDU, which is a component of the Amdahl 5995M Series Processor mainframe computer. The CDU is attached to the central processing unit frame of the computer by hoses through which a coolant, de-ionized water, is pumped. In particular, the CDU is designed to prevent the large-scale integrated circuits in the mainframe, also known as the multilayer glass assemblies or "MLAs," from overheating. As stated by Fujitsu, "the circulation of the water by the CDU enables heat generated by the multilayer glass ceramic assemblies ("MLAs") to be conducted into the coolant and then radiated from the coolant into the ambient air."

The CDUs at issue were entered under subheading 8471.99.90 of the Harmonized Tariff Schedule of the United States ("HTSUS") and its successor, subheading 8471.80.90, or under subheading 8473.30.40 and its successor, subheading 8473.30.50. Fujitsu Am., 342 F. Supp. 2d at 1328-29. Customs liquidated these entries under 8419.89.50 and its successor, subheading 8419.89.90. Id. Because the respective successor subheadings do not differ materially for purposes of this case from the earlier version of the HTSUS subheadings, we refer in this opinion to the earlier headings and subheadings, which were published in 1991.

Fujitsu filed protests in response to these liquidations, which were resolved by Customs Headquarters Ruling No. 960415 (June 9, 1998) ("HQ 960415"), which retained the classification under subheading 8419.89.50. Fujitsu appealed to the Court of International Trade, which affirmed Customs' classification. Fujitsu Am., 342 F. Supp. 2d at 1339. Fujitsu now appeals to this court. We have jurisdiction under 28 U.S.C. § 1295(a)(5).

## II

### A

The classification of imported merchandise is governed by the General Rules of Interpretation ("GRI") to the HTSUS. <u>Orlando Food Corp. v. United States</u>, 140 F.3d 1437, 1439-40 (Fed. Cir. 1998). The GRI provide that a product's classification is determined by first looking to the headings and section or chapter notes. "Absent contrary definitions in the HTSUS or legislative history, we construe HTSUS terms according to their common and commercial meanings." <u>E.T. Horn Co. v. United States</u>, 367 F.3d 1326, 1329 (Fed. Cir. 2004).

We review the grant of summary judgment by the Court of International Trade without deference. <u>Pomeroy Collection, Ltd. v. United States</u>, 336 F.3d 1370, 1371 (Fed. Cir. 2003). The degree of deference afforded to the underlying Customs' classification decision is governed by <u>United States v. Mead Corp.</u>, 533 U.S. 218 (2001). In short, we must give deference to the Customs ruling in this case commensurate with "the merit of its writer's thoroughness, logic and expertness, its fit with prior interpretations, and any other sources of weight." <u>Id.</u> at 235.

### B

Three HTSUS subheadings are at issue in this case: subheadings 8419.89.50, 8471.99.90, and 8473.30.40. Customs determined that the CDUs in this case could be classified under either heading 8419 or heading 8471. HQ 960415, slip op. at 6. Customs applied note 2 of chapter 84, which provides in pertinent part:

> Subject to the operation of note 3 to section XVI, a machine or appliance which answers to a description in one or more of the headings 8401 to 8424 and at the same time to a description in one or more of the

headings 8425 to 8480 is to be classified under the appropriate heading of the former group and not the latter.

Customs thus classified the CDU under subheading 8419.89.50. HQ 960415, slip op. at 6.

Fujitsu disagrees with Customs that its CDU could be classified under subheading 8419.89.50 and, therefore, argues that note 2 is irrelevant. Fujitsu contends that its CDU could be classified under either subheading 8471.99.90 or subheading 8473.30.40, but that it is most properly classified under subheading 8473.30.40.

Accordingly, this case turns on whether Customs correctly found Fujitsu's CDU classifiable under subheading 8419.89.50. If it could be so classified, then we need not reach Fujitsu's arguments concerning the other subheadings because note 2 would operate to require classification under 8419.89.50. Subheading 8419.89.50 covers:

> 8419   <u>Machinery</u>, plant or laboratory equipment, whether or not electrically heated, <u>for the treatment of materials by a process involving a change of temperature such as</u> heating, cooking, roasting, distilling, rectifying, sterilizing, pasteurizing, steaming, drying, evaporating, vaporizing, condensing or <u>cooling</u>, other than machinery or plant of a kind used for domestic purposes; instantaneous or storage water heaters, nonelectric; parts thereof:
>
> . . . .
>
> 8419.89   Other: . . .
>
>
> . . . .
>
> 8419.89.50       Other . . . 4.2%.

HTSUS Subheading 8419.89.50 (emphasis added).

**III**

Fujitsu points to three terms in heading 8419 in arguing that its CDU was not classifiable under subheading 8419.89.50 because it does not involve a process for cooling a material. Fujitsu primarily focuses on the term "involving a change of temperature." Fujitsu argues that its CDU does not involve a change of temperature because "the CDU's 'designed function' is to distribute water in order to prevent a change in temperature in the MLAs." Stated another way, Fujitsu argues that keeping the MLAs "at a constant temperature" does not involve a change of temperature.

We agree with the trial court that Fujitsu's argument must be rejected. First, determining whether Fujitsu's CDU is "[m]achinery . . . for the treatment of materials by a process involving a change in temperature," HTSUS Heading 8419, requires us to examine the process employed by the CDU itself, not the combined effect of the CDU and the operation of the computer. Second, we must look at the operation of the CDU, not its goal. As detailed above, the CDU first circulates water past the MLAs, where the MLAs are cooled and the water is warmed.[2] The warmed water is then circulated past an interface with the ambient air, where the water is cooled and the air is warmed, although only slightly. Even assuming that the cooling effect of the CDU is intended merely to counteract the heating of the MLAs by the operation of the computer, that fact is irrelevant. Because the CDU cools the MLAs, the term "involving a change in temperature" is met.[3]

---

[2] Although the continuous cycling of water through the CDU means that the incremental temperature changes of the MLAs are relatively small, nothing in heading 8419 excludes such continuous processes.

[3] Fujitsu raises two additional points, neither of which are persuasive. First, Fujitsu notes that in some instances the MLAs might become so hot that shutdown is required, despite the CDU. The mere fact that the CDU might not cause enough of a temperature change to prevent shutdown does not mean, however, that the process

05-1031                                    5

Fujitsu next addresses the term "materials" in the requirement that the imported device be "for the treatment of <u>materials</u> by a process involving a change of temperature." HTSUS Heading 8419 (emphasis added). In this case, both the MLAs and the water within the CDU have been considered "materials." Fujitsu argues that the MLAs are not "materials" because "[t]hey need no additional combination, refinement or manufacture in order to perform their designated function." To support this argument, Fujitsu relies on cases in which decisions between at least two competing classifications turned on the extent to which the imported good had been processed. "If the material has been so far processed from the 'material' stage to a partly-completed article, then it loses its character as material and takes on the characteristics of the article for which the material was intended." <u>Benteler Indus. v. United States</u>, 840 F. Supp. 912, 917 (Ct. Int'l Trade 1993) (internal quotation omitted).

Fujitsu's reliance on cases such as <u>Benteler</u> is misplaced. In this case, nothing in heading 8419 suggests that the term "materials" is used to differentiate relatively unprocessed goods from goods at a more advanced stage of the manufacturing process. To the contrary, heading 8419 includes subheadings addressing materials that are completely processed. For example, subheading 8419.20.00 covers "Medical, surgical or laboratory sterilizers," and applies to the treatment of finished medical devices, such as scalpels. Because the scope of heading 8419 must be broad enough to cover each of the subheadings, the term "materials" in heading 8419 cannot be

employed by the CDU does not involve any temperature change. Second, Fujitsu cites authority excluding machinery in which the cooling function is merely secondary from classification under heading 8419. Such authority is inapposite here because this case does not turn on distinctions between primary and secondary functions but instead on how to characterize the single function of the CDU -- removal of heat from the MLAs. In any event, the CDU's cooling capacity is its only and hence primary function.

limited in the way Fujitsu contends. Accordingly, we reject Fujitsu's argument that the term "materials" in heading 8419 is limited to relatively unprocessed goods.[4]

Fujitsu finally addresses the term "process" in the requirement that the imported device be "for the treatment of materials by a <u>process</u> involving a change of temperature." HTSUS Heading 8419 (emphasis added). Fujitsu contends that "[t]he mere dissipation of heat away from the MLAs does not rise to the level of a 'process,'" citing three Customs rulings in which heat sinks attached to personal computers were classified under subheading 8473.30.50, the successor to subheading 8473.30.40.

It is somewhat unclear what Fujitsu is contending. A part of Fujitsu's argument seems to be a claim that the process employed by the CDU is too simple to qualify as a "process." We find such a contention unpersuasive. Although the process employed by the CDU appears to be relatively simple, there is nothing in heading 8419 suggesting that the term "process" requires complex technology. The remainder of Fujitsu's argument appears to be the citations to the Customs headquarters rulings. These rulings, however, do not seem to relate to, let alone support, Fujitsu's "process" argument. Even assuming these rulings to be controlling, none of them discusses the term "process" in heading 8419 as a basis for their rulings. Customs Headquarters Ruling No. 965204 (July 2, 2002), the only of the three rulings even to refer to heading 8419, rests on the fact that the heat sinks in that case were specially designed for a particular processor. The ruling stated, in pertinent part:

> The heat sink assembly is essential to the proper functioning of the CPU [central processing unit]. It is sufficiently advanced to be neither accurately described as a fan nor as a machine for the treatment of

---

[4] Because we determine that the MLAs are "materials" under heading 8419 we need not determine whether the water within the CDU also qualifies as a material.

> materials by cooling. It is designed specifically by the shape and size of its parts and the manner of its assembly and attachment to the Pentium processor to fit into the electronic assembly inside of a CPU. Because of the specific design and assembly of the heat sink assembly, we do not believe it is a heat exchange device of heading 8419, HTSUS . . . .

Id. at 3. Thus, the headquarters rulings cited by Fujitsu provide no support for its argument that the manner in which the CDU dissipates heat from the MLAs is not a "process."

To the extent Fujitsu's argument may imply that the CDU does not operate a process because it does not involve separate, sequential steps, we must reject it on this basis as well. First, while the process may be viewed as continuous, the heading nowhere excludes a single-step process. Second, this CDU is better viewed as a two-step process, anyway. The first step is to transfer energy out of the ceramic array into the water and the second is to transfer that energy from the water to the outside air.

## IV

In sum, Fujitsu has identified no error in, nor reason for not giving deference under Mead to Customs' classification of the Fujitsu CDU under subheading 8419.89.50. Accordingly, we affirm.

<u>AFFIRMED</u>