KYOCERA INTERNATIONAL,
INC., Plaintiff,

v.

The UNITED STATES, Defendant.

Court No. 77–7–01123.

United States Court of International
Trade.

Sept. 11, 1981.

Spensley Horn Jubas & Lubitz, Los Angeles, Cal. (Stuart Lubitz and Wayne Willenberg, Los Angeles, Cal., at the trial and on the briefs), for plaintiff.

Stuart E. Schiffer, Acting Asst. Atty. Gen., Washington, D. C., Joseph I. Liebman, Atty. in Charge, Intern. Trade Field Office, Commercial Litigation Branch, New York City (Susan Handler-Menahem, Teaneck, N. J., at the trial and on the briefs), for defendant.

NEWMAN, Judge:

At issue is the scope and meaning of certain portions of item 685.90 of the Tariff Schedules of the United States (TSUS), and their application to the imported merchandise involved in this action.

Plaintiff imported certain ceramic articles from Japan used in integrated circuit devices, entered at the port of Los Angeles during 1976. The imports are described on the invoices as "MEP's" ("multilayer elec-

tronic parts"), with or without other descriptive information, and after further processing in the United States are used to "package" semiconductors.

The District Director classified the merchandise under item 685.90, TSUS, modified by T.D. 68–9 as "other electrical apparatus * * * for the protection of electrical circuits, or for making connections to or in electrical circuits", and assessed duty at the rate of 8.5 percent ad valorem. Plaintiff claims that the imported articles comprise parts of integrated circuits, and are properly dutiable under item 687.60, TSUS, modified by T.D. 68–9 as parts of "transistors and other related electronic crystal components" at the rate of 6.0 percent ad valorem.

For the reasons indicated below, plaintiff's claim is sustained.

## I.

The record herein consists of the testimony of three witnesses for plaintiff and of two witnesses for defendant, the official entry papers, twenty-two exhibits by plaintiff, and certain of defendant's answers to interrogatories and responses to requests for admissions.

Following are the relevant facts:

The imported merchandise comprises one of two major components of what is known in the semiconductor industry as a "multilayer integrated circuit package". In its imported condition, the merchandise in dispute is known as a "ceramic body" or "MEP", and consists of a minute piece of extremely hard ceramic material averaging about $3/4'' \times 1/4'' \times 1/16''$. Each ceramic body has a rectangular cavity in one of its two relatively large surfaces, and located around the interior surface of the rectangular cavity are a number of small discrete metallized areas called "bonding pads". Located along the two long narrow surfaces of the package are a number of other small discrete metallized areas called "brazing pads".

After importation, plaintiff performs the assembly and processing required to com-plete the integrated circuit package. Specifically, plaintiff attaches a "lead frame" to each of the brazing pads of the ceramic body, and then gold-plates all exposed metallic surfaces. After completion of assembly and processing, the integrated circuit packages function as a package or housing for an associated integrated circuit chip and are sold to integrated circuit manufacturers.

An integrated circuit chip, containing tens or hundreds (or perhaps thousands) of transistors or related semiconductor components, is a very small (typically $1/10'' \times 1/10'' \times {}^{15}/_{1000}''$ thick) and fragile piece of silicon. Inasmuch as such chips are fragile and extremely susceptible to corrosion damage when exposed to the normal environment, the chips must be physically shielded and protected by an appropriate housing or "package".

Following completion of assembly and processing by plaintiff, the subject merchandise provides this essential "housing" function by totally enclosing an integrated circuit chip in its internal cavity. When the package is ready to be used, an integrated circuit chip is first permanently affixed to the "die pad" in the package cavity. Thereupon, after minute "bonding wires" are connected from the chip to the bonding pads in the package cavity, a lid is permanently affixed to the multilayer package so as to completely close the cavity, and thus totally seal the integrated circuit chip from the outside environment.

When the integrated circuit chip is enclosed in the package and the small metal "tie bar" is clipped from the leads of the package, the entire assembly is known in the electronics industry as an "integrated circuit". Despite the complete enclosure of the integrated circuit chip by the multilayer package, the chip remains electrically coupled to the outside world by means of the electrical paths through the chip bonding wires, bonding pads, metallization embedded in the package, and the leads.

To summarize briefly, the imported merchandise is one of the major components of an integrated circuit package. An integrat-

ed circuit package, in turn, is used as the housing for a very fragile integrated circuit chip so that the extremely minute and complex electronic circuitry contained in the chip becomes commercially useful. In its final form, the combination of the chip in an integrated circuit package is known, and commercially marketed, as an integrated circuit.

## II.

Turning to the legal aspects, at the outset it should be noted that defendant concedes that the imports are parts of integrated circuits and as such are described in item 687.60, TSUS, as "other related electronic crystal components". However, in seeking to sustain the classification by the District Director under item 685.90, TSUS, defendant correctly points out that General Interpretative Rule 10(ij) of the *General Headnotes and Rules of Interpretation*, TSUS, provides that a provision for parts of an article does not prevail over a specific provision for such part. Upon this predicate, defendant contends that as to the integrated circuit packages in issue, item 685.90, TSUS is such a "specific" provision since it provides for "other electrical apparatus * * for the *protection* of electrical circuits, or for making *connections* to or in electrical circuits" (emphasis added).

In support of its contention that the imports are used for the "protection" of electrical circuits, defendant relies upon the following lexicographic definitions:

*Webster's Third New International Dictionary* (1963)

protect—1. to cover or shield from that which would injure, destroy or detrimentally affect...

*Funk & Wagnall's New Standard Dictionary of the English Language* (1956)

1. to keep as from harm, deterioration, danger, temptation or any other evil, by interposition, active or passive; preserve in safety; guard; shield;...

Based upon the foregoing definitions, there can be no doubt that the package *literally* "protects" the integrated circuit chip. Further, inasmuch as the package connects the electric circuitry of the integrated circuit chip to the circuitry of the outside world (or printed circuit board), the package *literally* makes connections to or in electrical circuits. In a word, defendant advances this literal application of the statute to the merchandise.

Plaintiff, on the other hand, urges a more limited construction of the statute, citing a technical lexicographic authority and legislative history. In essence, plaintiff argues that "electrical apparatus" used for the "protection of electrical circuits" refers to articles which provide electrical forms of protection (such as that provided for by fuses), and that "connections to or in electrical circuits" refers to renewable forms of connection or those that are readily susceptible to coupling and decoupling.

Respecting the common meaning of the term "protection", plaintiff has called attention to the following definition of "circuit protection" in the *Modern Dictionary of Electronics* (Fifth ed. 1977), at 120:

circuit protection—Automatic protection of a consequence-limiting nature used to minimize the danger of fire or smoke, as well as the disturbance to the rest of the system which may result from electrical faults or prolonged electrical overloads.

■ The field of electronics is, of course, a technical one, and it is well settled that in instances where the common meaning of a technical term is in issue, as here, reliance should not be confined to general lexicons, but technical dictionaries may be consulted. *Siemens America, Inc. and Siemens Corporation v. The United States*, 84 Cust.Ct. ____, C.D. 4856, 496 F.Supp. 266 (1980), affirmed as to this point, but reversed and remanded on other grounds. *United States v. Siemens America, Inc. and Siemens Corporation*, 68 CCPA ——, C.A.D. 1266, 653 F.2d 471 (1981).* Indeed, our Appellate

---

* Both parties cited the decision of this Court in their post-trial briefs. After the reversal and remand by the Court of Customs and Patent

Appeals, the parties requested and were granted leave to file supplemental briefs. Plaintiff filed its supplemental brief on August 28, 1981

Court has stressed: "too great reliance should not be placed on a general dictionary to determine the common meaning of technical terms." *Firth Sterling, Inc. v. United States*, 48 CCPA 130, 135, C.A.D. 779 (1961). See also, *United States v. The Spiegal Bros. Corp.*, 51 CCPA 69, 73, C.A.D. 839 (1964). While the terms "protection" and "connection" are in common usage, nevertheless they are clearly utilized in the statute in their *technical context* as used in the electronics field. *Cf. Brown Boveri Corp. v. United States*, 53 CCPA 19, 24, C.A.D. 870 (1966).

■ The testimony adduced by plaintiff establishes that the usage of the term "circuit protection" in the electronics field is entirely consistent with the technical dictionary definition above. It is fundamental that tariff terms presumably carry the meaning given them in trade and commerce. *Ozen Sound Devices v. United States*, 67 CCPA ——, C.A.D. 1246, 620 F.2d 880, 882 (1980); *Ameliotex, Inc. v. United States*, 65 CCPA 22, C.A.D. 1200, 565 F.2d 674 (1977); *Esco Manufacturing Co., aka J. Hofert Co. v. United States*, 63 CCPA 71, 73, C.A.D. 1167, 530 F.2d 949 (1976). Thus, plaintiff's expert witness Dickerson explained that the terms "electrical faults" and "prolonged electrical overloads" as used in the definition of "circuit protection" relate to the occurrence of excessive electrical current flowing through an electrical circuit. The record is clear that the imports do not protect circuits from electrical overloads, surges, or other *electrical* faults during abnormal situations (as do fuses and lightning arresters by the diversion of voltage or the interruption of current), and therefore do not perform the function of "circuit protection" as defined above. In sum, the lexicographic authority cited by plaintiff defines "protection" in the precise technical context in which the term is used in the statute, whereas the general dictionaries cited by defendant define the term "protection" in an abstract and non-technical sense.

■ In addition to technical lexicographic authority concerning the common meaning of "protection", plaintiff relies upon the *Explanatory Notes to the Brussels Nomenclature* (1955), heading 85.19, as a source of legislative history respecting item 685.90, TSUS. Fundamentally, the *Brussels Nomenclature* may be referred to "as an aid to interpreting" provisions of the TSUS where there is a "close similarity in the wording" of the two provisions. *United States v. Abbey Rents*, 66 CCPA 2, n. 5, C.A.D. 1213, 585 F.2d 501 (1978). In light of the similar phraseology in *Brussels* heading 85.19 and TSUS item 685.90, and the fact that there was no similar provision in the Tariff Act of 1930, it is beyond peradventure that the TSUS provision under construction was derived from the *Brussels Nomenclature*. Hence, the *Brussels Nomenclature* is part of the legislative history of item 685.90 and may be used as an aid to determining the intended scope of the TSUS provision.

■ Although legislative history is usually resorted to for the purpose of resolving ambiguity, it may also be studied to ascertain whether a literal interpretation conflicts with the intent of Congress, or whether certain words are employed with a meaning different from that usually given them. *Pacific Suppliers, Ltd. et al. v. United States*, 62 Cust.Ct. 517, C.D. 3819, 299 F.Supp. 1134 (1969); *W. R. Filbin & Co., Inc. v. United States*, 63 Cust.Ct. 200, 209, C.D. 3897 (1969). When acceptance of the literal meaning of words in a statute leads to results which are absurd or futile or plainly at variance with the policy of legislation, the legislative purpose will be followed. And even though, superficially, the meaning of statutory words appears clear, aids to their interpretation may be resorted to in pursuit of the purpose. *United States v. American Trucking Associations, Inc.*, 310 U.S. 534, 543–44, 60 S.Ct. 1059, 1064–65, 84 L.Ed. 1345 (1940).

Significantly, in *United States v. General Electric Co.*, 58 CCPA 152, 156, C.A.D. 1021, 441 F.2d 1186 (1971), the Appellate Court

---

and defendant filed its responsive supplemental brief on September 3, 1981. Siemen's petition for rehearing in the CCPA was denied on August 27, 1981.

adverted to appellant's reliance on the 1955 *Brussels Nomenclature* and the relevant explanatory notes in connection with item 685.90, TSUS, and made these illuminating comments:

> After a consideration of the language of item 685.90, *the background materials cited in aid of construction of that item,* and the arguments of counsel, we are not persuaded of reversible error in the decision of the Customs Court. We cannot agree with appellant's argument that rule 10(ij) requires that the provision of item 685.90 for 'other electrical apparatus for making or breaking electrical circuits' must prevail over the provision for parts of radio reception apparatus in item 685.-22. This is because we think the Customs Court was correct in its holding that the imported jacks, used in low current audio circuits, are not specifically provided for in item 685.90 since the items enumerated therein in all related to electrical power circuits.
>
> *We also think it pertinent to observe here that a seemingly broad descriptive tariff term is not to be taken as encompassing every article which may literally come within that term but rather only those articles of the type intended by Congress in enacting the TSUS. United States v. Andrew Fisher Cycle Co.,* 57 CCPA 102, C.A.D. 986 (1970). The jacks in the present case are not, in our opinion, the type of article Congress intended to encompass by item 685.90.
>
> We conclude with the Customs Court that 'other electrical apparatus for making or breaking electrical circuits' in item 685.90, TSUS, is not a specific provision for the imported jacks, and that the jacks are properly classifiable as parts of radio reception apparatus under item 685.22, TSUS. [Emphasis added]

■ The explanatory notes to the *Brussels Nomenclature* under heading 85.19 specifically identify the type of electrical devices "included" in the provisions for "apparatus for the protection of electrical circuits" and for "apparatus for making connections to or in electrical circuits". The short of the matter is that neither integrated circuit packages nor any devices serving a similar function are mentioned. Plainly then, integrated circuit packaging was not intended by Congress to be encompassed by the seemingly broad descriptions in item 685.90.

While defendant is quite correct that General Interpretative Rule 10(ij) provides that an article cannot be classified as a "part" if there is a specific provision for the article, to paraphrase *General Electric,* I conclude that "other electrical apparatus * * * for the protection of electrical circuits or for making connections to or in electrical circuits" in item 685.90, TSUS, "is not a specific provision" for the imported integrated circuit packages, and that the imports are properly classifiable as parts of "other related electronic crystal components" under item 687.60, TSUS. A semiconductor package is not, in my opinion, the type of article Congress intended to encompass by item 685.90. Consequently, it follows that General Interpretative Rule 10(ij) is not applicable in the instant case. The record establishes, and defendant concedes, that the imports are parts of "other related electronic crystal components".

Plaintiff's claim under item 687.60, TSUS is sustained; and judgment will be entered accordingly.