**BAXTER HEALTHCARE CORPORATION OF PUERTO RICO,**
Plaintiff–Appellant,

v.

**UNITED STATES, Defendant–Appellee.**

No. 98–1343.

United States Court of Appeals,
Federal Circuit.

July 2, 1999.

Rehearing Denied; Suggestion for Rehearing In Banc Declined
Sept 20, 1999.

Michael E. Roll, Katten Muchin & Zavis, of Chicago, Illinois, argued for plaintiff-appellant. With him on the brief were Mark S. Zolno, and Jennifer F. Kessinger.

Barbara S. Williams, Attorney, International Trade Field Office, Department of Justice, of New York, New York, argued for defendant-appellee. With her on the brief were David M. Cohen, Director, Civil Division, Commercial Litigation Branch, Department of Justice, of Washington, DC; and Joseph I. Liebman, Attorney in Charge, International Trade Field Office. Of counsel on the brief was Sheryl A. French, Attorney, Office of Assistant Chief Counsel, International Trade Litigation,

U.S. Customs Service, New York, New York.

Before MAYER, Chief Judge, NEWMAN, and LOURIE, Circuit Judges.

Opinion for the court filed by Circuit Judge LOURIE. Dissenting opinion filed by Circuit Judge NEWMAN.

LOURIE, Circuit Judge.

Baxter Healthcare appeals from the February 24, 1998 decision of the United States Court of International Trade denying its motion for summary judgment and granting the United States' cross-motion for summary judgment that the United States Customs Service (Customs) correctly classified its imported Oxyphan® product under subheading 5404.10.80, Harmonized Tariff Schedule of the United States, 19 U.S.C. § 1202 (1994) (HTSUS). *See Baxter Healthcare Corp. of Puerto Rico v. United States,* 998 F.Supp. 1133 (C.I.T. 1998). Because we conclude that Customs correctly classified the merchandise, we affirm.

## BACKGROUND

Between 1992 and 1994, Baxter bought and imported a product known as Oxyphan® in ten-kilometer spool units from Akzo Nobel Faser AG (Akzo) in Germany. Oxyphan® is a 0.4 mm-diameter polypropylene filament with a linear density greater than 67 decitex. However, it has characteristics unique among filaments in that it is hollow, it has a capillary-sized diameter, its microporous walls are gas-permeable, it has low tensile strength, and it does not undergo a drawing step during manufacturing. Akzo specifically designed Oxyphan® with these characteristics in mind for use as the gas-exchanging membrane of an oxygenator.[1] It has no other

known use. Baxter uses Oxyphan® to make its Univox® membrane oxygenator product. To make an oxygenator, Baxter groups seven or eight lengths of Oxyphan®, ties them together, wraps them around a cylindrical steel bellow twenty-two times, and encloses the assembly in a polycarbonate manifold with two sets of inlet and outlet ports. Each spool of Oxyphan® membrane contains enough membrane to make approximately four oxygenators, but the exact length of membrane required per oxygenator is not fixed. During operation, oxygen-deficient blood is pumped around the Oxyphan® membranes while oxygen is simultaneously pumped through the membranes. Because the membrane is gas-permeable, oxygen diffuses out of the membrane hollows into the blood, and carbon dioxide diffuses from the blood into the membrane hollows and out an exit port.

At issue in this case is Oxyphan®'s proper classification in the HTSUS. The parties dispute which of the following headings and subheadings constitutes the proper classification for Oxyphan®:

5404 *Synthetic monofilament* of 67 decitex or more and of which no cross-sectional dimension exceeds 1 mm; strip and the like (for example, artificial straw) of synthetic textile materials of an apparent width not exceeding 5 mm:

5404.10 Monofilament:

\* \* \*

5404.10.80 Other

\* \* \*

\* \* \*

9018 *Instruments* and appliances *used in medical, surgical,* dental or

---

1. An oxygenator is "a device which mechanically oxygenates venous blood extracorporeally. It is used in combination with one or more pumps for maintaining circulation during open heart surgery and for assisting the circulation in patients seriously ill with some cardiac and pulmonary disorders." Dorland's Illustrated Medical Dictionary 1210 (28th ed.1994) (hereinafter "Dorland's"). A

membrane oxygenator is an oxygenator "in which blood and oxygen are separated by a semipermeable membrane ... across which gas exchange occurs. The membrane may be arranged as ... a number of hollow fibers; ... the blood may flow inside the fibers, which are surrounded by gas, or the blood may flow outside the fibers and the gas inside the fibers." *Id.*

**1336**

veterinary *sciences,* including scintigraphic apparatus, other *electro-medical apparatus* and sight-testing instruments; *parts* and accessories *thereof:*

\* \* \*

9018.90 Other instruments and appliances and parts and accessories thereof:

\* \* \*

Other

\* \* \*

*Electro-medical instruments* and appliances and *parts and accessories thereof:*

9018.90.60 *Electro-surgical instruments* and appliances, other than extracorporeal shock wave lithotripters; all the foregoing and parts and accessories thereof

9018.90.70 Other

\* \* \*

\* \* \*

9019 Mechano-therapy appliances; massage apparatus; psychological aptitude-testing apparatus; ozone therapy, oxygen therapy, aerosol therapy, *artificial respiration* or other therapeutic respiration *apparatus; parts* and accessories *thereof:*

\* \* \*

9019.20.00 Ozone therapy, oxygen therapy, aerosol therapy, *artificial respiration* or other therapeutic respiration *ap-*

*paratus; parts* and accessories *thereof*

HTSUS (1994 ed.).[2]

Customs classified Oxyphan® under subheading 5404.10.80 and liquidated it at the corresponding general duty rate of 7.8% *ad valorem. See Baxter,* 998 F.Supp. at 1135. Baxter timely protested Customs' classification, which protest was denied. *See* United States Customs Service Headquarters Ruling Letter No. 950047 (Dec. 3, 1991). Baxter then challenged Customs' classification in the Court of International Trade. It asked the court to order Customs to reliquidate its Oxyphan® entries either under subheading 9019.20.00, as a "part" of an "artificial respiration apparatus," at the corresponding 3.7% general duty rate, or under subheading 9018.90.70, as a "part" of an "other" "electro-medical instrument or appliance," at 4.2%, and to refund the excess duty with interest. *See Baxter,* 998 F.Supp. at 1135. The government responded that Customs either correctly classified Oxyphan® under subheading 5404.10.80, or that it should have classified it under subheading 9018.90.60, as a "part" of an "electro-surgical instrument or appliance," and liquidated it at 7.9%. *See id.* at 1137.

Baxter and the government each cross-moved for summary judgment. *See id.* at 1135. The court held that Customs correctly classified Oxyphan® as a synthetic monofilament because it was both "synthetic" and a "monofilament" as both those terms are defined by the Notes in the HTSUS, the Explanatory Notes, several general and technical dictionaries, and Baxter's expert witnesses. *See id.* at 1139–45. The court in fact relied heavily on Baxter's expert witnesses. The court further reasoned that Customs properly classified Oxyphan® as an independent article, not as a "part" or "unfinished part,"

**2.** For consistency, all references to the HTSUS are to the unsupplemented 1994 edition. Subheading 5404.10.80 was subheading 5404.1020 in the 1992 HTSUS edition; however, this difference is immaterial because the general classification scheme and the applicable general rates of duty remained the same from 1992 to 1994.

because its use as a "part" of an oxygenator could not be discerned at the time of import and because each spool of Oxyphan® underwent substantial processing—cutting, intertwining with another monofilament, wrapping around a bellow, and further cutting—before it obtained . the character of an oxygenator "part." *See id.* at 1145–49. The court rejected Baxter's argument that Customs should have classified Oxyphan® as a "part" of an artificial respiration apparatus for the further reason that Baxter's oxygenator did not perform the mechanical breathing function common to other artificial respiration apparatuses. *See id.* at 1149–50.

Baxter timely appealed to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5) (1994).

## DISCUSSION

### A. *Standard of Review*

■ We review the Court of International Trade's grant of summary judgment in a trade classification case for correctness as a matter of law, deciding *de novo* whether genuine issues of material fact exist. *See Bauerhin Techs. Ltd. Partnership v. United States,* 110 F.3d 774, 776 (Fed.Cir.1997). Determining the meaning of a tariff term is a question of law. *See Totes, Inc. v. United States,* 69 F.3d 495, 498 (Fed.Cir.1995). However, if we determine that an HTSUS provision is ambiguous and that Customs has promulgated a regulation that "fills a gap or defines a term in a way that is reasonable in light of the legislature's revealed design, we give [that] judgment 'controlling weight.'" *United States v. Haggar Apparel Co.,* ⸺ U.S. ⸺, ⸺, 119 S.Ct. 1392, 1399, 143 L.Ed.2d 480 (1999) (alteration in original) (quoting *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)) (overruling prior Federal Circuit cases that failed to give *Chevron* deference to Customs regulations). "Determining whether a particular imported item falls within the scope of the various classifications as properly construed is a question of fact." *Bauerhin,* 110 F.3d at 776. Furthermore, Customs' classification determination is presumed to be correct. *See* 28 U.S.C. § 2639(a)(1) (1994). Therefore, as the party challenging the classification, Baxter bore the burden of proof. *See Totes, Inc.,* 69 F.3d at 498. In this case, the structure and use of Oxyphan® is not in dispute, and Customs has not promulgated any regulations interpreting these headings and subheadings. Our analysis concerning whether Oxyphan® has been properly classified only requires a determination of the proper meaning and scope of the relevant provisions and a determination of the ultimate classification.

### B. *The Meaning and Scope of the Proposed Headings*

■ The HTSUS consists of "(A) the General Notes; (B) the General Rules of Interpretation [GRI]; (C) the Additional U.S. Rules of Interpretation [US GRI]; (D) sections I to XXII, inclusive (encompassing chapters 1 to 99, and including all section and chapter notes, article provisions, and tariff and other treatment accorded thereto); and (E) the Chemical Appendix. . . ." *See* 19 U.S.C. § 3004(a) (1994) (set out as a note preceding 19 U.S.C. § 1201). The proper classification of all merchandise is governed by the GRI, containing rules which are applied in numerical order, and the U.S. GRI. *See, e.g., Orlando Food Corp. v. United States,* 140 F.3d 1437, 1439 (Fed.Cir.1998).

■ "Classification is to be determined according to the terms of the headings and any relevant section or chapter notes." GRI 1. "[A] court first construes the language of the heading, and any section or chapter notes in question, to determine whether the product at issue is classifiable under the heading." *Orlando Food,* 140 F.3d at 1440. Absent contrary legislative intent, HTSUS terms are to be "construed [according] to their common and popular meaning." *Marubeni Am. Corp. v. United States,* 35 F.3d 530, 533 (Fed.Cir.1994). "To assist it in ascertain-

**1338**

ing the common meaning of a tariff term, the court may rely upon its own understanding of the terms used, and it may consult lexicographic and scientific authorities, dictionaries, and other reliable information." *Brookside Veneers, Ltd. v. United States,* 847 F.2d 786, 789 (Fed.Cir.1988).

 Baxter challenges Customs' classification of the subject merchandise under heading 5404, which includes "synthetic *monofilament[s]* of 67 decitex or more and of which no cross-sectional dimension exceeds 1 mm" (emphasis added). Baxter argues that the term "monofilament" means a long fiber or filament that has tensile strength and undergoes a drawing process. Baxter concedes that Oxyphan® is a filament, but argues that it not a "monofilament" because it lacks tensile strength (due to its porosity) and does not undergo a drawing process. Baxter supports its interpretation with testimony from two of its experts. The government asserts that the term "monofilament" simply means one filament, without any particular tensile strength or drawing requirements. The government supports its interpretation with numerous general and technical dictionaries and two Explanatory Notes to the HTSUS.[3] One Explanatory Note states that a "synthetic monofilament" is a filament "extruded as a single filament." *See* 4 Customs Co-operation Council, Harmonized Commodity Description and Coding System: Explanatory Notes § XI 54.04, at 754 (1st ed.1986) (hereinafter Explanatory Notes). Another states that a "monofilament" is "one filament" and that a "multifilament" is "two or more filaments." *See id.* § XI General Note (I)(B)(1)(i)(b), at 707. The government also relies on alleged admissions of a Baxter witness.

We agree with the government that the merchandise is described by the 5404 heading. The term "monofilament" commonly conveys the broad meaning of having "one filament" without any particular

tensile strength or drawing requirements. Under the proper construction of this term, therefore, there is no genuine dispute that Oxyphan® is a "monofilament." Since Baxter concedes that Oxyphan® measures more than 67 decitex and has a diameter of less than 1 mm, it clearly falls within the scope of heading 5404.

 However, Baxter asserts that, even if heading 5404 describes the merchandise, the most appropriate heading is 9019. This heading consists of "mechanotherapy appliances; massage apparatus; psychological aptitude-testing apparatus; ozone therapy, oxygen therapy, aerosol therapy, *artificial respiration* or other therapeutic respiration *apparatus; parts* and accessories *thereof*". (emphasis added). Baxter argues that Oxyphan® is a "part" of an "artificial respiration apparatus" for two reasons. First, Baxter argues that Oxyphan® is a "part" of a Univox® membrane oxygenator because it is the oxygenator's principal and essential component and it has no other use. Second, Baxter argues that a membrane oxygenator is itself an artificial respiration apparatus. The government argues that Oxyphan® is not a "part," but an independent article, because it has not been modified (by being cut to specific lengths or by being attached to something else) at the time of import and thus does not possess the "essential character" of an oxygenator at that time. The government also contends that a membrane oxygenator is not an artificial respiration apparatus.

 We agree with the government that Oxyphan® is not properly classified as a "part" of a membrane oxygenator. Whether an imported item that is made into multiple parts after import is classifiable as "parts" of other articles under the HTSUS involves two questions. First, the item must be dedicated solely or principally for use in those articles and must not have substantial other independent com-

---

**3.** The Explanatory Notes are nonbinding interpretations of the HTSUS developed by the World Customs Organization. *See FMC Corp.*

*v. Up–Right, Inc.,* 21 F.3d 1073, 1078 (Fed. Cir.1994).

mercial uses. *See Bauerhin,* 110 F.3d at 779. If the item has substantial other commercial uses, "it is a distinct and separate commercial entity," not a part. *Id.* (quoting *United States v. Willoughby Camera Stores, Inc.,* 21 C.C.P.A. 322 (1933)). In this case, it is undisputed that Oxyphan® has no commercial use other than making membrane oxygenators and therefore is "dedicated" to such use.

■ Second, if the item as imported can be made into *multiple* parts of articles, the item must identify and fix with certainty the individual parts that are to be made from it. *See The Harding Co. v. United States,* 23 C.C.P.A. 250, 253 (1936). In *Harding,* our predecessor court held that an imported item made from asbestos yarn, wire, and a mixture of other materials, used for the sole purpose of making brake linings, was properly classified as a manufacture of yarn rather than as a "part" of an automobile because the individual brake lining parts to be made from it were not identified or otherwise "fixed with certainty"; rather, the item had to be individually cut to custom fit each brake shoe made. *See id.* at 252–53. "In the condition as imported, the long roll of brake-lining material has in no manner been dedicated to the making of any *particular* brake lining. To be a *part* of an automobile, that is a brake lining, it must be more than mere material for making a brake lining." *Id.* at 252 (emphasis added). In this case, it is undisputed that each roll of Oxyphan® contributes material to approximately four oxygenators. At the time of import, the individual parts cannot be discerned from the roll, and the roll nowhere marks or otherwise identifies the individual parts to be made from it. Rather, Baxter individually cuts lengths of Oxyphan® from a roll and custom-fits them around a steel bellows. The exact length needed per oxygenator is not known until the oxygenator is made. Because the individual parts are not identifiable or fixed at the time of import, Oxyphan® cannot be classified as a "part" of an oxygenator.

Since we agree with the government that Oxyphan® is not a "part" of an oxygenator for classification purposes, we need not decide whether an oxygenator is an "artificial respiration apparatus" under heading 9019. Similarly, we need not decide whether an oxygenator is an "electrosurgical instrument" under heading 9018. We are left, therefore, only with heading 5404, in particular, subheading 5404.10.80.

## CONCLUSION

The Court of International Trade correctly determined that Customs correctly classified the imported Oxyphan® membrane under subheading 5404.10.80.

*AFFIRMED*

PAULINE NEWMAN, Circuit Judge, dissenting.

I respectfully dissent. It is undisputed that the Oxyphan® filamentous membrane is designed for and used solely with a membrane oxygenator and is not a separate and distinct commercial entity. Moreover, a membrane oxygenator can not function without Oxyphan®. Therefore the Oxyphan® membrane is properly classified as a "part" of an oxygenator. *See Bauerhin Techs. Ltd. Partnership v. United States,* 110 F.3d 774, 779 (1997) ("an imported item dedicated solely for use with another article is a 'part' of that article within the meaning of HTSUS") (citing *United States v. Pompeo,* 43 C.C.P.A. 9 (1955)); *Bauerhin* at 779 (an "'integral, constituent, or component part, without which the article to which it is to be joined, could not function as such article' is surely a part for classification purposes") (quoting *United States v. Willoughby Camera Stores, Inc.,* 21 C.C.P.A. 322, 324 (1933)).

The panel majority states that the Oxyphan® filamentous membrane is not a "part" because it is imported on a roll, and a roll of Oxyphan® "nowhere marks or otherwise identifies the individual parts" of oxygenators. However, as the panel ma-

jority recognizes, it is undisputed that each roll of Oxyphan® contains the material for the manufacture of approximately four oxygenators. Applying the panel majority's rationale, Oxyphan® would be a "part" if it were simply repackaged so that each roll held one-fourth its capacity. There is no support in the case law for such a tenuous distinction, and no reliable law can flow from its promulgation.

*The Harding Co. v. United States,* 23 C.C.P.A. 250 (1936) does not require otherwise. The court in *The Harding,* discussing whether the imported item in that case (brake lining material) was a part of an automobile, stated that "[t]o be a part of an automobile, that is a brake lining, [the imported item] must be more than mere material for making a brake lining." 23 C.C.P.A. at 252. In the case at bar, Oxyphan® is not "mere material" for making a part of an oxygenator—it is itself the part of the oxygenator that accomplishes the oxygenating function. It is a part "without which the article to which it is to be joined, could not function as such article." *Bauerhin,* 110 F.3d at 779; *Willoughby Camera,* 21 C.C.P.A. at 324; *see also Snow's United States Sample Express Co. v. United States,* 8 Ct. Cust. 17, 21 (1917) (discussing whether merchandise "was committed to a specific use and was so far advanced that it had an individuality which identified it in its unfinished state as the thing it would be when finished").

The panel majority recognizes that "it is undisputed that Oxyphan® has no commercial use other than making membrane oxygenators and therefore is 'dedicated' to such use." Maj. Op. at 1339. It is also undisputed that membrane oxygenators can not oxygenate blood without Oxyphan®. It is time to provide consistent and clear guidance. The standards set forth in *Pompeo, Willoughby Camera,* and *Bauerhin,* are straightforward, logical, and in accordance with the principles of the HTSUS. Applying these principles and precedent, the Oxyphan® membrane is properly classified a "part" of an oxygena-

tor. Thus I must dissent from the court's contrary ruling.