Slip Op. 06 - 187

UNITED STATES COURT OF INTERNATIONAL TRADE

- - - - - - - - - - - - - - - - - - - -X

KYOCERA INDUSTRIAL CERAMICS CORPORA-  :
TION,
                                       :

                    Plaintiff,
                                       :

          v.                              Court No. 02-00705
                                       :

UNITED STATES,                         :

                    Defendant.         :

- - - - - - - - - - - - - - - - - - - -X

Opinion

[Upon cross-motions as to classification of
 certain ceramic substrates for electronic
 integrated circuits, summary judgment for
 the defendant.]

Decided: December 21, 2006

DeKieffer & Horgan (J. Kevin Horgan and A. David Lafer) for the plaintiff.

Peter D. Keisler, Assistant Attorney General; Barbara S. Williams, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Jack S. Rockafellow); and Office of Assistant Chief Counsel, International Trade Litigation, U.S. Bureau of Customs and Border Protection (Michael W. Heydrich), of counsel, for the defendant.

AQUILINO, Senior Judge: Defendant's motion to dismiss plaintiff's amended complaint for lack of subject-matter jurisdiction having been denied by the court in slip opinion 03-148,

27 CIT 1703, 293 F.Supp.2d 1360 (2003), reh'g denied (Nov. 18, 2004), familiarity with which is presumed, the parties have now interposed cross-motions for summary judgment as to the correct classification of certain imported ceramic substrates for electronic integrated circuits ("IC substrates") that underlie this action.

I

As recited in slip opinion 03-148, paragraph 7 of the amended complaint avers that,

> [p]rior to March 10, 1999, blank IC substrates imported by KICC[1] were classified under HTSUS subheading 8542.90, as parts of integrated circuits, based on HQ 088157 (July 2, 1992), *i.e.*, the "Diacon Ruling," which classified ceramic pieces used as bases for integrated circuits under HTSUS 8542.90, a duty-free classification. The classification determination made in the Diacon Ruling was followed by KICC and Customs until Customs issued NY D88010 (March 10, 1999), which classified blank IC substrates of porcelain under HTSUS 6914.10.8000 as "Other ceramic articles: Of porcelain or china: . . . Other," dutiable at 9% *ad valorem*.

27 CIT at 1706, 293 F.Supp.2d at 1362 (footnote omitted). Certain numbered protests covered by this pleading encompass entries prior to that day in 1999. Moreover, plaintiff's papers in opposition to defendant's motion to dismiss contained a copy

---

[1] This is counsel's choice of reference to their plaintiff client.

of the following declaration to the Customs Service sworn to soon

thereafter by KICC's erstwhile import/export specialist:

> 2.   In 1992, I became aware of a new ruling, HQ
> 088157 (July 2, 1992) (i.e., the "Diacon Ruling"),
> which affected the tariff classification of blank
> ceramic substrates imported by KICC.  The Diacon Ruling
> held that "ceramic pieces" used as mounting bases for
> electronic integrated circuits were properly classified
> under subheading 8542.90 of the . . . HTSUS[] as parts
> of integrated circuits.
>
> 3.   Upon learning of the Diacon Ruling, I trans-
> mitted a copy . . . to all of KICC's customs brokers in
> the ports then being used by KICC to import ceramic
> substrates.  I instructed the brokers to classify all
> of KICC's ceramic substrates for integrated circuits in
> accordance with the Diacon Ruling.
>
> 4.   At the same time I advised KICC's customs
> brokers to attach a copy of the Diacon Ruling to each
> ceramic substrates entry packet submitted to USCS.
>
> 5.   When KICC underwent a National Customs Survey
> Audit by the USCS in 1993-95, the auditors reviewed the
> tariff classification of KICC's imports, including the
> tariff classification of blank ceramic substrates.  The
> auditors did not object to any of KICC's classi-
> fications.
>
> 6.   On several occasions during my tenure with
> KICC, I discussed with employees of USCS the
> implications of the Diacon Ruling for the tariff
> classification of ceramic substrates imported by KICC.
> During these conversations, the USCS employees never
> objected to the classification of ceramic substrates in
> accordance with the Diacon Ruling.[2]

---

[2]  Plaintiff's Memorandum in Support of Motion for Summary
Judgment, Exhibit 5; 27 CIT at 1706-07, 293 F.Supp.2d at 1363
(footnote omitted).  The acronym "USCS" refers to the Customs
Service, as it was then still known.

A

The plaintiff takes the position that Customs "issued a new ruling modifying the Diacon Ruling but has not published notice of that ruling in the Customs Bulletin." First Amended Complaint, para. 15. Hence, this "new ruling" is ineffective upon a reading of 19 U.S.C. §1625(c), which provides:

> A proposed interpretive ruling or decision which would—
>
>> (1) modify (other than to correct a clerical error) or revoke a prior interpretive ruling or decision which has been in effect for at least 60 days; or
>>
>> (2) have the effect of modifying the treatment previously accorded by . . . Customs . . . to substantially identical transactions;
>
> shall be published in the Customs Bulletin. The Secretary shall give interested parties an opportunity to submit, during not less than the 30-day period after the date of such publication, comments on the correctness of the proposed ruling or decision. After consideration of any comments received, the Secretary shall publish a final ruling or decision in the Customs Bulletin within 30 days after the closing of the comment period. The final ruling or decision shall become effective 60 days after the date of its publication.

The focus of plaintiff's complaints has been on foregoing subsection (c)(1). Plaintiff's subsequently-filed memorandum in

support of its motion for summary judgment, pages 9-10, added

that subsection (c)(2) required Customs to publish

> notice in the Customs Bulletin before implementing a
> ruling modifying the tariff treatment of Kyocera's
> blank ceramic substrates because the ruling had the
> effect of modifying the treatment accorded to sub-
> stantially identical transactions involving the
> importation of blank ceramic substrates by Kyocera
> during the preceding seven years.

This additional claim caused the defendant to file a

motion to strike it from this action or to stay proceedings

herein and remand it for initial administrative determination.

This court granted the alternative relief prayed for.  Whereupon

Customs and Border Protection, as it has now become known, issued

HRL 967539 (April 25, 2005), concluding that

> there is insufficient evidence to substantiate that
> KICC had a treatment.  KICC's treatment claim is here-
> by denied.

(1)

According to the plaintiff, "the Diacon Ruling required

that all ceramic substrates for integrated circuits be classified

under HTSUS 8542.90"[3] and the subsequent rulings "constituted a

modification of the Diacon Ruling by limiting its application".

Plaintiff's Memorandum, p. 19.  That it pertained to *all ceramic*

---

[3] First Amended Complaint, para. 15.

*substrates for integrated circuits*, however, cannot be gleaned from the text of the ruling. Indeed, the word "substrate" is not to be read therein. Appended as exhibits 9-12 to plaintiff's summary-judgment memorandum are the protest that resulted in the Diacon Ruling; an April 30, 1992 Memo re Meeting with Laboratories & Scientific Services Related to Diacon Ruling; a Memo from Laboratories & Scientific Services to Chief, Metals and Machinery Branch Related to Diacon Ruling; and a September 19, 1990 Letter from Sandler, Travis & Rosenberg Related to Diacon Ruling. These exhibits do contain the phrases "ceramic substrates or chip carriers", "ceramic substrate, a housing for an electronic integrated circuit", "ceramic substrate or chip carriers", and "alternatively referred to as . . . [']ceramic substrates'", respectively. But compare HQ 088157, wherein the word substrate does not once appear.

Be the exact content of that Diacon Ruling as it is, the defendant

> flatly reject[s] the conclusion that the [subject imports] — or that earlier entries of substantially similar merchandise — were substantially identical to the ceramic pieces at issue in the Diacon Ruling. In contrast, [it] direct[s] the Court's attention to the drawings and accompanying description in the Diacon Patent, which demonstrate that the ceramic pieces

> described as "substrate" therein are each used to house
> an individual IC chip [], and are **not** used themselves,
> as is Kyocera's substrate, in making IC chips.

Defendant's Memorandum in Opposition, p. 3 (internal citation omitted; boldface in original). Plaintiff's exhibits, which, as noted, do refer to the imports in Diacon as "substrates", nonetheless support defendant's position that, whatever their nomenclature, they were used for housing IC chips, not in making such chips, which is the function of the ceramic pieces at bar. The exhibits cited also contain phrases such as "[t]he ceramic substrates or chip carriers are the housings for semiconductor devices or integrated circuits"; "[i]t is a ceramic substrate, a housing for an electronic integrated circuit"; "the ceramic base does not come into contact with the electrical circuit"; and "used exclusively in the semiconductor industry in leaded chip carriers, flatpacks, hybrid packages, etc. . . . which house electronic integrated circuit chips."

A substrate is defined in The Free On-line Dictionary of Computing, http://foldoc.org/, © 1993-2005 Denis Howe, as

> [t]he body or base layer of an integrated circuit,
> onto which other layers are deposited to form the
> circuit. . . . It is used as the electrical ground for
> the circuit.

The aforementioned Memo from Laboratories & Scientific Services to Chief, Metals and Machinery Branch Related to Diacon Ruling states that "the ceramic base does not come into contact with the electrical circuit and does not appear to serve any electrical insulating function."  In contrast thereto, plaintiff's proffered Statement of Material Facts as to Which There is No Genuine Issue to Be Tried explains:

> 1.   . . . The substrates are used in the United States solely or principally as bases in the production of integrated circuits [].  . . .
>
> * * *
>
> 4.   At the time of importation, these substrates are dedicated to their use as IC substrates.  There is no other regular commercial application for these articles.
>
> 5.   In general, Kyocera's customers for blank ceramic substrates are laser houses that will . . . generally sell the scored substrates to IC manufacturers who will, in the case of thick-film substrates, use screen printing to place resistors and electrical interconnects for multiple IC's on the substrate.  In the case of thin film substrates, resistors and interconnects are achieved through vacuum deposition or sputtering. Additional components (*e.g.*, monolithic integrated circuits, transistors, diodes) are then affixed to the substrate.  The result is a square or rectangle consisting of multiple hybrid integrated circuits on a conjoined substrate.

Footnotes omitted.

Due to the material differences between the subject imports at issue in each case, this court cannot and therefore does not conclude that the Diacon Ruling applied to "all ceramic substrates for integrated circuits". It was not modified or revoked by the later 1999 or 2002 rulings, and the procedures of 19 U.S.C. §1625(c)(1) did not govern plaintiff's imports.

(2)

With regard to plaintiff's alternative claim of "treatment", in Arbor Foods, Inc. v. United States, 30 CIT ___, ___, Slip Op. 06-74, p. 16 (May 17, 2006), the court held that,

> [t]o establish a violation of § 1625(c)(2), [a party] must show that: "(1) an interpretive ruling or decision (2) effectively modifie[d] (3) a 'treatment' previously accorded by Customs to (4) 'substantially identical transactions', and (5) that interpretive ruling or decision has not been subjected to the notice-and-comment process outlined in § 1625(c)(2)." Precision Specialty Metals, Inc. v. United States, 24 CIT 1016, 1040, 116 F.Supp.2d 1350, 1374 (2000).

That is, in order to prevail on its subsection 1625(c)(2) claim, KICC has the evidentiary burden of showing that the 1999 Ruling *effectively modified a treatment previously accorded by Customs to substantially identical transactions*. See 19 C.F.R. §177.12(c)(1)(iv). To quote again from Arbor Foods,

> [b]ecause § 1625(c) does not define treatment, the agency and the reviewing court give[] the undefined

term its ordinary meaning. . . . In <u>Precision Specialty Metals</u>, the court held that "treatment" refers to the actions of Customs and that § 1625(c) allows importers to order their behavior based on Customs' prior actions. . . . Customs, however, narrowed the scope of actions that constitute treatment under § 1625(c). In 19 C.F.R. § 177.12(c), Customs stated that "[it] will give no weight whatsoever to informal entries or transactions which [it], in the interest of commercial facilitation and accommodation, processes expeditiously and without examination or Customs officer review." 19 C.F.R. § 177.12(c)(1)(ii) (2006). The Federal Circuit subsequently held that this was a permissible construction of § 1625(c) that warrants deference and that entries liquidated under Customs' "bypass" proce-dures are not considered "treatments" for the purposes of § 1625(c). . . .

30 CIT at ___, Slip Op. 06-74, p. 17 (case citations omitted).

Here, the plaintiff claims that it "was not required to comply with these later-adopted regulations when it invoked section 1625 in its protest filed in October 2000". Plaintiff's Memorandum, p. 18. However, the court of appeals has held in <u>Motorola, Inc. v. United States</u>, 436 F.3d 1357, 1366 (Fed.Cir. 2006), that

[i]t makes no difference to our analysis that the regulation was promulgated in 2002, after the controversy arose and after this litigation began. So long as an agency's interpretation of a statute is not a "post hoc rationalization . . . seeking to defend past agency action against attack," <u>Auer v. Robbins</u>, 519 U.S. 452, 462 . . . (1997), or "wholly unsupported by regulations, rulings or administrative practice," <u>Smiley v. Citibank (S.Dak.), N.A.</u>, 517 U.S. 735, 741 . . . (1996)(quoting <u>Bowen v. Georgetown Univ. Hosp.</u>, 488 U.S. 204, 212 . . . (1988)), *Chevron* deference is

due even if the adoption of the agency's interpretation postdates the events to which the interpretation is applied.

Subsection 177.12(c)(1)(i) of 19 C.F.R. provides that, to substantiate a claim of "treatment", there must be evidence to establish that

(A) There was an actual determination by a Customs officer regarding the facts and issues involved in the claimed treatment;

and subsection (c)(1)(iv) adds that the

evidentiary burden as regards the existence of the previous treatment is on the person claiming that treatment. The evidence of previous treatment by Customs must include a list of all materially identical transactions by entry number (or other Customs assigned number), the quantity and value of merchandise covered by each transaction (where applicable), the ports of entry, the dates of final action by Customs, and, if known, the name and location of the Customs officer who made the determination on which the claimed treatment is based. In addition, in cases in which an entry is liquidated without any Customs review (for example, the entry is liquidated automatically as entered), the person claiming a previous treatment must be prepared to submit to Customs written or other appropriate evidence of the earlier actual determination of a Customs officer that the person relied on in preparing the entry and that is consistent with the liquidation of the entry.

Although the plaintiff discounts the need to follow these regulations, it argues compliance in that KICC "inform[ed] Customs of its reliance on the Diacon Ruling on multiple

occasions orally and in documentary form by including the Diacon Ruling in its entry packages." Plaintiff's Reply Memorandum, p. 19. The plaintiff asserts that it "should not be penalized because [the Customs officer] was not paying attention despite [KICC's] repeated efforts to inform him of that fact." Id. at 20. The requirement is actual determination, however, not attempted notice by an importer.

Additionally, the plaintiff claims satisfaction of subsection 177.12(c)(1)(i)(A), supra, in that the requisite evidence is "clearly establish[ed]" in the declarations designated exhibits 5 and 6, and executed by Michael G. Lubitz and Penny A. Evans, KICC's Import/Export Specialist during the period 1991–1995 and the company's Manager of the Import/Export Department from 1990 through 1994, respectively. In addition to the representations quoted from the Lubitz declaration, supra, the Evans declaration states:

> 2. In 1992, I was advised by Joyce Bryant of USCS's Otay Mesa office that a new ruling, HQ 088157 (July 2, 1992)(i.e., the "Diacon Ruling"), was issued that affected the tariff classification of blank ceramic substrates imported [by] Kyocera []. The Diacon Ruling held that "ceramic pieces" used as mounting bases for electronic integrated circuits were properly classified under subheading 8542.90 of the [HTSUS] as parts of integrated circuits.

While there may well have been no objection on the part of Customs, that was not the equivalent of a positive determination that would satisfy the standard of subsection 177.12(c)(1)(i)(A). With regard to the foregoing paragraph from the Evans declaration, in its Diacon Ruling Customs cites Kyocera Int'l, Inc. v. United States, 2 CIT 91, 527 F.Supp. 337 (1981), aff'd, 69 CCPA 168, 681 F.2d 796 (1982), for support of its classification decision. That matter dealt with imports described as "ceramic articles" which, "[a]fter completion of assembly and processing . . . function as a package or housing for an associated integrated circuit chip". 2 CIT at 91, 92, 527 F.Supp. at 337, 338. Therefore, the Diacon Ruling could or would apply to certain KICC ceramic imports, and it would not be incorrect for Customs officers to so react. But, there is no support on the record, adduced from plaintiff's declarations or otherwise, that "[t]here was an actual determination by a Customs officer regarding the facts and issues involved in the claimed treatment" herein.

Counsel have also filed Plaintiff's Supplemental Statement of Material Facts as to Which There is No Genuine Issue to Be Tried. Among other things, it represents that, "[p]rior to

the issuance of NY D88010 on March 10, 1999, blank ceramic substrates imported by Kyocera were consistently classified under HTSUS subheading 8542.90." The declaration of Gregory Onses and list of entries attached thereto are presented to prove this point. However, as long as evidence is absent that such classification was the result of an actual determination by a Customs officer and those elements spelled out by 19 C.F.R. §177.12(c)(1)(iv), the presentment is not conclusive. Moreover, the court notes in passing that the attached list of "Blank Substrates Totals by Line Item" fails to reveal the ports of entry, the dates of final action by Customs, and the name(s) and location(s) of Service officer(s) who made any determination(s) on which the claimed treatment is based. The list also fails to prove that its imports were "materially identical transactions".

In sum, the evidence submitted, such as it is, does not establish that "Customs approved the classification of [subject] blank ceramic substrates as parts of ICs", as claimed in plaintiff's motion for summary judgment. There is nothing to suggest that the imports at issue were processed after an examination by Customs or after Service-officer review of the

kind contemplated by 19 C.F.R. §177.12(c)(1)(i)(A), supra, and there certainly is not adequate factual evidence within the meaning of subsection 177.12(c)(1)(iv). This court thus concludes that the plaintiff has failed to satisfy the burden required to prevail on its "treatment" claim under 19 U.S.C. §1625(c)(2).

II

Independent of any legal consequence of the Diacon Ruling for the merchandise still at bar[4], the plaintiff continues to press for classification under HTSUS chapter 85, heading 8542, as follows:

| 8542 | Electronic integrated circuits and microassemblies; parts thereof: |
|------|--------------------------------------------------------------------|
|      | * * *                                                              |
| 8542.90.00 | Parts |

That is, plaintiff's protests of classification under HTSUS sub-heading 6914.10.80 ("Other ceramic articles: Of porcelain or

---

[4] Included in plaintiff's entries were substrates for magnetic head sliders in disc drives for automatic data processing machines, the classification of which is not at issue herein. See Slip Op. 03-148, 27 CIT at 1704 and 293 F.Supp.2d at 1361 n. 3.

china: . . . Other") led Customs to issue HQ 964811 (May 1, 2002), which opted for subheading 6909.11.40, to wit:

    6909            Ceramic wares for laboratory, chemical
                    or other technical uses; . . .

    6909.11                      Of porcelain or china:

                              *   *   *

    6909.11.40                    Other


                                   A

        Each side is of the view that this action is ripe for summary judgment.  See, e.g., Defendant's Memorandum, p. 7; Plaintiff's Reply Memorandum, p. 1.  Upon review of all of the papers filed in support of, and in opposition to, the parties' cross-motions, the court cannot conclude that there is any genuine issue of material fact that cannot be resolved without a trial.  Cf. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  Indeed, a "classification decision, ultimately, is a question of law based on two underlying steps."  Universal Elecs., Inc. v. United States, 112 F.3d 488, 491 (Fed.Cir. 1997). First, the court must define the terms in the relevant classification headings, then it has to determine under which of them the subject imports more correctly land.  Id.  When defining the terms in a tariff heading, the court proceeds *de novo*, for

"[i]t is emphatically the province and duty of the judicial department to say what the law is."  Id. at 492, quoting Marbury v. Madison, 5 U.S. 137, 177 (1803).  "Although our review is *de novo*, we accord deference to a Customs' classification ruling in proportion to its 'power to persuade' under the principles of Skidmore v. Swift & Co., 323 U.S. 134 . . . (1944)."  Cummins Inc. v. United States, 454 F.3d 1361, 1363 (Fed.Cir. 2006)(case citations omitted).

HTSUS General Rule of Interpretation ("GRI") 1 is that, "for legal purposes, classification shall be determined according to the terms of the headings and any relative section or chapter notes" of the HTSUS.  And the "heading which provides the most specific description shall be preferred to headings providing a more general description."  GRI 3(a).  Additional U.S. Rule of Interpretation 1(c) states that

> a provision for parts of an article covers products solely or principally used as a part of such articles but a provision for "parts" . . . shall not prevail over a specific provision for such part . . ..

(1)

Accordingly, if the ceramic substrates at issue herein are parts of electronic integrated circuits at the time of their importation, they should be classified under subheading

8542.90.00, supra, it being more specific.  On the other hand, if the subject imports are not "parts thereof", heading 6909 must be considered.  Cf. Bauerhin Technologies Ltd. Partnership v. United States, 110 F.3d 774, 779 (Fed.Cir. 1997)("a provision for a part must prevail over a mere basket provision").

Here, the meaning of subheading 8542.90.00 focuses on the word "parts".  The question of whether something is a part or a material has been considered in numerous prior cases.  In Baxter Healthcare Corp. v. United States, 182 F.3d 1333 (Fed.Cir. 1999), for example, the court considered whether Oxyphan®, which was imported in ten-kilometer spools, was a part or a material for purposes of the HTSUS.  The exact length of the Oxyphan® required for each finished item was not fixed with certainty at the time of entry.  Post-importation, it was cut, tied in groups, and wrapped around a steel bellow.  The court relied on the following two-prong analysis:

> . . . First, the item must be dedicated solely or principally for use in those articles and must not have substantial other independent commercial uses. See Bauerhin, 110 F.3d at 779. . . . Second, if the item as imported can be made into *multiple* parts of articles, the item must identify and fix with certainty the individual parts that are to be made from it.  See The Harding Co. v. United States, 23 C.C.P.A. 250, 253 (1936).

182 F.3d at 1338-39 (emphasis in original).

At bar, the defendant "admits that at the time of importation, the principal commercial use of Kyocera's articles is as IC substrates, and that as so used, the substrates are dedicated to that use." Defendant's Response to Plaintiff's Statement of Material Facts, para. 4. Cf. Plaintiff's Statement of Material Facts, para. 4. Therefore, the focus now is on the second element of the Baxter test.

In that case, the court found that the rolls of Oxyphan® were not parts "[b]ecause the individual parts are not identifiable or fixed at the time of import," thereby failing the "fix with certainty the individual parts that are to be made from it" standard. See 182 F.3d at 1339. Cf. Benteler Industries, Inc. v. United States, 17 CIT 1349, 1356, 840 F.Supp. 912, 918 (1993)(a laser cutting process eliminated need for physical mark-ings yet the number of parts was fixed with certainty prior to importation). In Ludvig Svensson (U.S.) Inc. v. United States, 23 CIT 573, 62 F.Supp.2d 1171 (1999), the function and composi-tion of screens for greenhouses that were of high technology, design and planning were found to not have been altered by post-importation processing, which included cutting, sewing two screens together, and adding tape and hooks. That processing was

found to be minor, attributable to installation.  In E.M. Chemicals v. United States, 13 CIT 849, 728 F.Supp. 723 (1989), aff'd, 920 F.2d 910 (Fed.Cir. 1990), liquid crystals that had been processed sufficiently to dedicate their use in LCDs and whose post-importation treatment consisted of adding a twist agent and then placing the mixture between two panels was found to be assembly.  Additionally in that case, although the size of the display to which the liquid crystals would be ultimately dedicated was not known at the time of importation, their character was found to be fixed with certainty at that time due to advanced manufactured state.

Courts have considered the extent of post-importation processing in other cases.  See, e.g., Heraeus-Amersil, Inc. v. United States, 10 CIT 258, 640 F.Supp. 1331 (1986)(post-importation cutting of contact tape and positioning and welding to certain strength requirements an assembly process, not further processing); The Servco Co. v. United States, 68 Cust.Ct. 83, C.D. 4341 (1972), aff'd, 60 CCPA 137, C.A.D. 1098, 477 F.2d 579 (1973)(imports in the shape and form of pipes and tubes not parts due to substantial post-importation processing necessary before they could be drill collars).

(2)

In a case such as this, the court must review the underlying agency analysis to determine whether it "is eligible to claim respect." United States v. Mead Corp., 533 U.S. 218, 221 (2001). The level of respect the court can afford a Customs ruling depends upon

> the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944). Additionally,

> [b]y statute, Customs' classification decision is presumed to be correct. 28 U.S.C. § 2639(a)(1). . . . The presumption of correctness [] carries force on any factual components of a classification decision, such as whether the subject imports fall within the scope of the tariff provision, because *facts* must be proven via *evidence*.

Universal Elecs., Inc. v. United States, 112 F.3d at 491-92 (internal quotations omitted; emphasis in original).

In HQ 964811 (May 1, 2002), relying on Baxter Healthcare Corp., supra, Customs provided KICC with the following rationale for its decision to deny classification of its blank

ceramic substrates as parts of electronic integrated circuits and

microassemblies under HTSUS subheading 8542.90:

> As the instant articles are eventually cut into multiple parts, the protestant relies on Benteler Indus., Inc. v. U.S., 840 F.Supp. 912 (CIT 1993), for the proposition that the laser cutting process used on the substrates negates the need for markings. In Benteler, measurements for cutting the steel tubing sections used in car doors were programmed into the laser-cutting machine. We find this argument unpersuasive. In that case, the court held that an indiscernible number of articles could not be made from the steel tubing sections upon entry. See id[.] at 918. The number of beams to be cut from the sections was known prior to importation, and the sections were color-coded and number-coded, as the design of each section was specific to a particular door type and door structure. See id. That is not the case here. The number of individual substrates, and thus integrated circuits, to be made on the blank ceramic substrates is not discernible upon importation. The blanks are sold to "laser houses," where various integrated circuits are fabricated according to customer specifications.

> Moreover, the premise that small articles imported in one piece should be classified as if already cut apart when all that remains to be done is the cutting, see United States v. Buss, 5 Ct. Cust. App. 110, T.D. 34138 (1914), is not relevant here because what remains to be done to the substrates is far more than mere cutting. The "laser houses" first must fabricate integrated circuits, which involves a series of etching and implantation steps on the whole piece of ceramic before it can be cut into individual parts. . . . These steps exceed the minimal processes performed on the screens in Ludvig Svensson . . ..

> Without the post-importation processing, or any other identifying characteristic, the ceramic pieces,

like the rolls of Oxyphan in Baxter . . . cannot be
distinguished at importation as parts of electronic
integrated circuits or microassemblies. The identity
of the substrates as parts of electronic integrated
circuits or microassemblies is not fixed with
certainty because the substrates are blank; there are
no circuit elements. Accordingly, neither type of
blank ceramic substrate [is] classifiable under sub-
heading 8542.90, HTSUS.

In its motion for summary judgment, the plaintiff

counters that

it is clear that the absence of visible markings on
the IC substrates to indicate individual parts does
not preclude classification of the merchandise as
parts. As the Court of International Trade recognized
in *Benteler*, . . . where the imported merchandise is
to be cut using a laser cutting machine programmed to
cut the merchandise, visible markings on the imported
merchandise are unnecessary.

Plaintiff's Memorandum, p. 14. HQ 964811, however, discusses

Benteler in determining that the substrates are not parts and

clearly distinguishes that case where "[t]he number of beams to

be cut from the sections *was known* prior to importation", and

the sections were appropriately coded. Emphasis added.

Although the plaintiff would interpret Customs' use of the word

"discernible" to signify visible markings for cutting lines, it

is clear to this court that that agency usage is akin to

"fixed", as used in Baxter and Benteler, supra, and in keeping

with the established rule regarding "parts" as discussed herein-above.

Given that Kyocera generally did not know at the time of importation (1) "the sizes of individual integrated circuits [] into which any of the subject substrates would ultimately be cut"; (2) "the number of resistors, transistors, diodes, and/or capacitors which were intended to be placed on each of the ICs"; (3) "the specific intended design of the interconnects [] to be placed on each of the ICs"; (4) "the electric or electronic articles which would incorporate the ICs";[5] or whether any bi-polar substrates or metal-oxide semi-conductor ICs are made on any of the subject substrates,[6] the court cannot conclude that HQ 964811 is unfounded and therefore not "eligible to claim respect" within the meaning of Skidmore, supra.

(3)

Should the court defer to HQ 964811, it still must ensure that the Customs choice of tariff classification is "correct". Jarvis Clark Co. v. United States, 733 F.2d 873, 876-78, reh'g denied, 739 F.2d 628 (Fed.Cir. 1984). While, as

---

[5] Defendant's Statement of Undisputed Material Facts, paras. 1 to 4.
[6] See id., paras. 5, 6.

quoted above, that ruling letter concludes that the identity of the substrates as parts of electronic integrated circuits or microassemblies is not fixed with certainty because the substrates are blank; there are no circuit elements, further discussion is warranted.

When pre-importation processing leaves a good in such "an advanced manufactured state" or "of such high technology, design and planning" that it is dedicated for one purpose, its identity can be said to have been set. See generally E.M. Chemicals and Ludvig Svensson (U.S.) Inc., supra. For post-importation processing to be substantial, it must "alter the function or composition of the [import]". Ludvig Svensson (U.S.) Inc. v. United States, 23 CIT at 583, 62 F.Supp.2d at 1180. Here, it is undisputed that, pre-importation, KICC's imports are fabricated in such a manner as to engender technical properties that are required for use as IC substrates. See Plaintiff's Statement of Material Facts as to Which There is No Genuine Issue to Be Tried, paras. 2 and 2[7]; Defendant's Response to Plaintiff's Statement, paras. 2 and 2. In fact, it is reasonably clear that "ceramic products" can be highly developed

---

[7] Plaintiff's statement has consecutive paragraphs numbered "2".

where their manufacturing process includes preparation of the paste, shaping, drying, firing, and finishing. See, e.g., World Customs Organization, Harmonized Commodity Description and Coding System, 3 Explanatory Notes 995-96 (2d ed. 1996).

Ludvig Svensson (U.S.) Inc., E.M. Chemicals and Baxter Healthcare Corp. all dealt with imports in an advanced manufactured state. In the first two of those cases, the court found that the imports were merely assembled post-importation. In Baxter, the court found that cutting lengths of the imported Oxyphan®, tying them together, wrapping them around a cylinder 22 times and enclosing them in a manifold was significant post-importation processing.

In this action, at the times of importation of the substrates, KICC did not know the IC finished size, materials therein, or ultimate use thereof. See Defendant's Statement of Undisputed Material Facts, paras. 1-8. The blanks were sold to some 60 companies, typically laser houses rather than IC manufacturers, where, in turn, such houses would score the substrates, create required holes, and then generally sell them further processed to IC manufacturers. See id., paras. 9-12. If this, in fact, was what first happened to plaintiff's

products upon entry, it cannot be said that they were not subjected to substantial further processing, as discussed and defined in the cases cited.  It was that processing which transformed the imported ceramic ware for technical use into part of an electronic integrated circuit.  Ergo, this court is required to conclude that plaintiff's products were and are properly classified under HTSUS subheading 6909.11.40, supra.

III

In view of the foregoing, plaintiff's motion for summary judgment as filed must be denied.  Judgment will enter accordingly.

Decided:  New York, New York
          December 21, 2006

/s/ Thomas J. Aquilino, Jr.____
             Senior Judge